IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-00334-RBJ-MJW

BRIAN HICKS,

Plaintiff,

v.

STEPHANIE PODOLAK,
RENE GARCIA,
SHAWN KUTA,
SHIKAH DOSANJ,
STEVE BROWN,
SEAN SNIDER, and
JOHNNY CHAVEZ,

Defendants.

---

## RECOMMENDATION ON
## MOTION TO DISMISS BY STEPHANIE PODOLAK (Docket No. 98)
## and
## MOTION TO DISMISS BY DEFENDANTS GARCIA, KUTA, DOSANJ, BROWN,
## SNIDER, AND CHAVEZ (Docket No. 99)

---

**Entered by Magistrate Judge Michael J. Watanabe**

This matter was referred to this court pursuant to an Order of Reference to

United States Magistrate Judge issued by Judge R. Brooke Jackson on May 3, 2012

(Docket No. 24).

## PLAINTIFF'S ALLEGATIONS

The original Prisoner Complaint (Docket No. 1) was filed on February 8, 2012.  It

was dated two days before, February 6, 2012.  The pro se incarcerated plaintiff, Brian

Hicks, was directed by the court to resubmit his Complaint using the court's current

2

form.  (Docket No. 6).  A First Amended Complaint was thus filed on March 2, 2012.

(Docket No. 9).  The court dismissed the claims against two of the named defendants.

(Docket No. 11).  After motions to dismiss were filed by the remaining defendants

(Docket Nos. 35 and 47), plaintiff was granted leave to file a Second Amended

Complaint (see Docket No. 80), which was filed on October 31, 2012 (Docket No. 85).

On November 15, 2012, Judge Jackson dismissed the claims against defendant Blake

Davis without prejudice based upon the plaintiff's failure to serve and failure to

prosecute.  (Docket No. 105).  In addition, plaintiff has withdrawn all claims against the

United States, and thus his fifth claim for relief contained in the Second Amended

Complaint (Docket No. 85 at 27) was withdrawn.  (Docket Nos. 109 and 120).  Plaintiff

alleges the following in his Second Amended Prisoner Complaint (Docket No. 85)

against the remaining defendants in the four remaining claims.

　　　During the investigation into the January 1, 2007, drive-by murder of Denver

Bronco Darrent Williams, it was determined that an SUV registered to the plaintiff was

the vehicle used during the crime.  Plaintiff was incarcerated at the Denver County Jail

when the homicide occurred and claims to have played no part in the killing,[1] but law

enforcement believed he had information about the crime because his SUV was

involved.  As a result, plaintiff was immediately moved to a solitary confinement unit at

the jail, and during the days following the murder, numerous Denver homicide

detectives attempted to contact and question plaintiff.  At that time, plaintiff had no

information about Williams' death and exercised his right to remain silent, but for

months the Denver detectives relentlessly continued to try to question him.

---

[1]In May 2010, Willie Clark was convicted of killing Williams.

3

On May 8, 2007, plaintiff was taken into federal custody following an indictment on drug charges.  After his arraignment, he was ordered detained pending trial, and he was transferred to the Federal Detention Center in Englewood, Colorado ("FDC-ENG"), where he was placed in Unit A in the facility's general population.  He remained there for over a year without incident during which time law enforcement officials continued to investigate aggressively the Darrent Williams case.  Although plaintiff was not a suspect in the shooting, his name was frequently mentioned in media reports as the owner of the SUV used in the drive-by shooting.  FCI Englewood ("FCI-ENG") personnel were aware of the media coverage prior to plaintiff's arrival at that facility and during the one-year period he was in general population.

On June 3, 2008, plaintiff met with his attorney who advised him that he had met with federal prosecutors who told him they would offer plaintiff a plea deal in exchange for his cooperation in the Darrent Williams case.  Plaintiff declined the offer and informed his attorney he did not want to cooperate with the government.  His attorney advised him that he had been told to inform plaintiff that if he kept refusing to cooperate, prosecutors would "come down hard on him," and additional charges would be filed against him in his drug case.  Plaintiff again declined the offer and advised counsel that he did not want to cooperate with the government.  Days later plaintiff was informed that a superseding indictment had been returned against him in the drug case, adding more charges.

Shortly after the indictment was returned, plaintiff was removed from general population at FDC-ENG and placed in the Special Housing Unit ("SHU") at FCI-ENG. Plaintiff made numerous demands to be informed why he was removed from general

4

population.  He initially received conflicting information from FCI-ENG staff, but after

several weeks in segregation, Warden Blake Davis informed plaintiff that the Assistant

U.S. Attorney assigned to plaintiff's drug case directed that plaintiff be placed in the

SHU.

On August 21, 2008, while housed in the SHU, plaintiff was told by Correctional

Officer Brian Kemp that defendant Lieutenant Steve Brown from the SIS department

was asking to speak with plaintiff outside of his cell.  Plaintiff told Kemp he did not want

to speak with SIS.  Shortly thereafter, Kemp returned to plaintiff's cell and said that if

plaintiff refused to leave his cell and speak with SIS, he would be disobeying a lawful

order and would eventually be taken from the cell by force.  Plaintiff refused, and Kemp

walked away.

Minutes later, Brown and defendant SHU Lieutenant Sean Snider came to the

cell requesting that plaintiff leave his cell and be interviewed by them.  Plaintiff again

refused.  Both lieutenants became irate and told plaintiff he would be "gassed,"

forcefully extracted, and never be allowed to return to the general population at FDC-

ENG if he continued to refuse to leave the cell and conduct the interview.  Plaintiff

continued to refuse, and both lieutenants walked away, stating they would return

shortly.  Moments later they returned with two homicide detectives from the Denver PD

working on the Williams case.  They asked plaintiff if he would allow them to interview

him regarding the homicide, and again plaintiff refused.  Plaintiff believes Brown and

Snider were trying to deceive him and coerce him by threats of force into forfeiting his

right to remain silent and right against self-incrimination.  After this incident, plaintiff filed

a grievance with defendant FDC-ENG Unit Manager Shawn Kuta, but Kuta did not

respond.

Plaintiff remained in the SHU at FCI-ENG from July 27, 2008, until May 13, 2009, at which time he was transferred to Unit B in the general population at FDC-ENG where he remained without incident until July 1, 2009, when he was transferred to the SHU pursuant to an alleged BOP investigation. He was released from the SHU on September 13, 2009, and transferred to the general population in Unit A without incident until October 2, 2009, when he was again placed in the SHU at FCI-ENG. The following day he received an administrative detention order stating he had been placed in the SHU pending a BOP investigation. On October 8, 2009, the new Warden, defendant Rene Garcia, informed plaintiff his SHU placement was beyond his control and he was instructed to place plaintiff in the SHU by "outside sources," but Garcia would not tell who they were.

On July 13, 2010, plaintiff's appointed counsel in his drug case moved for a court order either allowing her to have contact visits with plaintiff while he remained in the SHU, asserting his placement in SHU significantly interfered with his right to counsel and violated Due Process because it was not done for penological purposes, or directing plaintiff be transferred to the general population. In response, the government disputed plaintiff's claims of constitutional deprivations and asserted that plaintiff's continued confinement in SHU was based upon penological security concerns. The government submitted the affidavit of defendant FCI-ENG Captain Johnny Chavez which alleged several security concerns as justification for plaintiff's continued SHU confinement. These security concerns were fabricated, were substantially different from Warden Garcia's alleged reasons, and were contrary to Chavez's prior statements to

plaintiff that the AUSA assigned to plaintiff's drug case was solely responsible for plaintiff's placement and continued segregation.  Plaintiff has been repeatedly informed verbally and in writing that the AUSA's office, and specifically defendant AUSA Stephanie Podolak, was responsible for his segregation.  BOP administrator Donald Griggs testified under oath that FCI-ENG officials were ordered by law enforcement to place plaintiff in segregation.

Plaintiff brings the following claims for relief.

### Claim One.  42 U.S.C. § 1983/Bivens Conspiracy.

Each defendant conspired to house him in solitary confinement indefinitely in response to his refusal to cooperate with law enforcement, deprived him of the right to be free from cruel and unusual punishment, denied him substantive and procedural Due Process, deprived and interfered with his right to petition and access the courts, denied him Equal Protection under the law, and intentionally and/or recklessly engaged in outrageous conduct which inflicted emotional distress.

Defendant Podolak is the lead prosecuting attorney assigned to plaintiff's drug prosecution in this court (Case No. 07-cr-00184-WYD).  According to information provided to plaintiff by Davis, Garcia, and other FCI-ENG personnel, Podolak was the driving force behind plaintiff's placement and continued confinement in segregation, which she did in response to his refusal to cooperate with law enforcement.

Defendant Garcia, as Warden of FCI-ENG, was legally responsible for the operation of FCI-ENG and for the welfare of all inmates housed there.  Defendant Captain Chavez was legally responsible for overseeing the overall operations of the custody department at FCI-ENG and for the welfare of all inmates housed at FCI-ENG.

These defendants conspired with Podolak and others in placing and holding plaintiff in solitary confinement indefinitely under punitive conditions.  Garcia informed plaintiff he was ordered by Podolak to place plaintiff in the SHU.  Chavez informed plaintiff that FCI-ENG officials were ordered by Podolak to place him in the SHU.  While knowing plaintiff was not in any way a threat to the safety and security of FCI-ENG, these defendants agreed to place plaintiff in the SHU based on this order, knowing their actions would violate plaintiff's constitutional rights.

Plaintiff has been told by numerous FCI-ENG staff members that the welfare and custody of SHU inmates, and the decisions to place, hold, and/or release inmates from the SHU, are make weekly by a "team" or prison administrators, including the Warden, Captain, SIS and SHU lieutenants, Unit Managers, and others.  Defendant Unit Managers Kuta and Shikah Dosanj were responsible for reviewing and resolving inmate appeals and grievances and were part of the "team" making the SHU housing decisions. The threats of defendants Brown and Snider to "gas" and forcefully extract plaintiff from his SHU cell and their informing plaintiff that he would remain in SHU indefinitely for refusing to be interviewed by police were overt acts in furtherance of the conspiracy against plaintiff's rights.  These defendants were also part of the "team" making the SHU housing decisions.  They were present during discussions when plaintiff was informed that Podolak was responsible for plaintiff's SHU placement and thus were aware of the conspiracy to punish plaintiff for exercising his constitutional rights and consented to and assisted in enforcing Podolak's orders to segregate plaintiff.

Defendants Garcia, Kuta, and Dosanj fabricated penological security concerns in BOP administrative documents in order to justify plaintiff's segregation and to conceal

the ongoing conspiracy to punish plaintiff for exercising his constitutional rights.  In

addition, defendant Chavez did so in court documents in order to justify plaintiff's

segregation, prevent him from having confidential communications with his attorneys,

and conceal the ongoing conspiracy to punish plaintiff for refusing to cooperate with law

enforcement.

### Claim Two.  Fifth Amendment - Cruel and Unusual Punishment.

Each defendant was aware that plaintiff was a pretrial detainee housed in the

SHU at FCI-ENG and personally participated in, allowed, and/or consented to the

conspiracy to punish him for exercising his constitutional rights.  The highly-restrictive

conditions of plaintiff's confinement have been and continue to be "atypical and

significant" in comparison to other pretrial detainees housed at FDC-ENG who are

similarly situated.  He is housed in a solitary confinement cell for 23 hours a day,

Monday through Friday.  He is allowed to leave the cell for recreation for one hour at a

time, Monday through Friday.  Recreation is not permitted on weekends, and thus he is

confined to a cell for 24 hours on weekends.  He is allowed to shower only three days

out of the week.  Every time he leaves the cell, he is handcuffed behind his back, pat-

searched, scanned with a metal detector, and escorted by two officers.  He is allowed to

make only one personal call per week and is not provided with commissary and other

recreation activities as are other pretrial detainees at FDC-ENG.  Plaintiff is a Type 2

diabetic with hypertension, and as a result of his conditions of confinement, his health

has deteriorated substantially, including, loss of approximately 20 pounds, severe stress

and anxiety, and difficulty controlling his blood sugar and blood pressure levels.

9

**Procedural Due Process.**

**(a) Confinement from July 27, 2008, to May 13, 2009.**  Contrary to BOP

regulations (28 C.F.R. § 541.11(b)), plaintiff did not receive documentation detailing the

reason for his SHU placement until September 11, 2008, which was 47 days after being

segregated.  Defendants Brown, Snider, and Kuta were responsible for complying with

this regulation because they were part of the team of prison administrators in charge of

SHU inmates.  Plaintiff was never given a hearing pursuant to BOP regulations (28

C.F.R. § 541.22(c)) to determine whether his continued segregation was necessary.

**(b) Confinement from October 2, 2009, to date.**  Even though administrative

detention is to be used only for short periods of time, plaintiff has been so confined for

870 days and counting.[2]  In addition, he has not had the requisite review hearing every

30 days pursuant to 28 C.F.R. § 541.22(c).

**Claim Three.  Access to the Courts.**

**(a) First Amendment Violation - Right to Petition.**  Defendant Kuta refused to

respond to plaintiff's administrative appeal regarding the threats of force made to him by

defendants Brown and Snider in August 2008.  As a result, he denied plaintiff of the

right to petition the courts and superior BOP administrators regarding the threats made

to him and the conspiracy against his rights.

**(b) Fifth and Fourteenth Amendment Violations - Substantive and**

**Procedural Due Process.**  After being placed in administrative detention on June 27,

2008, plaintiff informed Davis and other BOP personnel that the SHU law library did not

---

[2]Plaintiff notes in his Response, however, that he was in SHU only until
November 20, 2012.  (Docket No. 115 at 2).

10

contain case law and other legal resources necessary to conduct legal research. Although plaintiff was represented by counsel in the drug case, he maintained the right to assist in his defense.  Davis responded that the SHU law library met all requirements outlined in BOP policy and advised plaintiff to make a request to the education department if additional materials were needed.  Upon making requests for case law to the education department, plaintiff was told he would be "charged" for copies of case law.

The materials in that library were substantially inadequate compared to the law library for pretrial detainees at FDC-ENG.  No other pretrial detainee was required to "pay" the facility in order to read legal opinions, and plaintiff would not have had to do so if he were not housed in SHU.  Since Podolak ordered plaintiff's placement in the SHU, she too is liable for this claim.

**Claim Four.  Fifth and Fourteenth Amendment Violations-Equal Protection.**

Almost 100 people were arrested in connection with the "Rolling 30's drug conspiracy."  Hundreds of media reports were generated, most of which listed the names and photographs of individuals arrested.  At least ten of those mentioned in the reports, not including plaintiff, were housed at FDC-ENG, but plaintiff was the only Rolling 30's defendant placed in segregation due to the alleged publicity surrounding the case.  Plaintiff was verbally informed by Davis that plaintiff's initial confinement in SHU on June 27, 2008, was at the direction of the AUSA, thus confirming plaintiff's assertions that he was segregated and singled out for punishment for wholly arbitrary reasons while others who were similarly situated were not.  Plaintiff's claim of equal protection violations related to his time spent in the SHU from June 2008 through May

2009 are attributable to defendants Podolak, Brown, Snider, and Kuta because they were all involved in the conspiracy to punish him for exercising his constitutional rights.

Other pretrial prisoners (some of whom are named in the pleading), in addition to the Rolling 30's defendants mentioned above, whose cases received media attention and who were also housed at FDC-ENG awaiting trial on criminal charges similar to plaintiff's, were never placed in segregation based on media reports.  Plaintiff's claim of equal protection violations related to the time spent in SHU from October 2009 to present are attributable to defendants Podolak, Garcia, Chavez, and Dosanj because they were involved in the conspiracy to punish him for exercising his constitutional rights.

"The defendants named in this complaint, in various ways, conspired, encouraged, allowed, acquisced [sic] in, supervised, and/or personally participated in orchestrating a campaign of official harassment directed at [plaintiff] out of sheer malice, for his refusal to cooperate with law enforcement and the exercise of constitutionally protected rights.  The defendants' actions were vindictive and enforced with the intent to deprive [plaintiff] of Equal Protection under the law.  As a 'class-of-one,' [plaintiff] has been irrationally and arbitrarily singled out for punishment by the defendants."  (Docket No. 85 at 26).

Plaintiff seeks declaratory, injunctive, and monetary relief.

## DEFENDANTS' MOTIONS TO DISMISS

Now before the court for a report and recommendation are the following two motions: (1) a Motion to Dismiss by Stephanie Podolak (Docket No. 98) and (2) a Motion to Dismiss by Defendants Garcia, Kuta, Dosanj, Brown, Snider, and Chavez

(Docket No. 99).  Plaintiff filed a Response to each of the two motions (Docket Nos. 114 and 115), and defendants filed Replies (Docket Nos. 121 and 122).  The court has very carefully considered these motions papers, has taken judicial notice of the court file and of Criminal Action No. 07-cr-00184-WYD-4, and has considered applicable Federal Rules of Civil Procedure and case law.  The court now being fully informed makes the following findings, conclusions of law, and recommendation.

In both motions, defendants seek dismissal of the Second Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  Defendant Podolak seeks dismissal on the following grounds: (1) plaintiff's claims for money damages are barred by the statute of limitations; (2) failure to state a claim against Podolak; (3) Podolak is entitled to qualified immunity on all claims; and (4) to the extent plaintiff brings official capacity claims against Podolak, those claims should be dismissed for lack of jurisdiction. Defendants Garcia, Kuta, Dosanj, Brown, Snider, and Chavez seek dismissal on the following grounds: (1) plaintiff's claims for money damages regarding his initial placement and confinement in the SHU (from July 27, 2008, until May 13, 2009) and his subsequent placement (on October 2, 2009) are barred by the statute of limitations; (2) failure to state a claim against defendants; (3) defendants are entitled to qualified immunity; and (4) to the extent plaintiff brings official capacity claims for damages or official capacity claims against defendants who no longer work at FCI-ENG, those claims should be dismissed for lack of jurisdiction.

Rule 12(b)(1):

empowers a court to dismiss a Complaint for "lack of jurisdiction over the subject matter."  Fed. R. Civ. P. 12(b)(1).  As courts of limited jurisdiction, federal courts may only adjudicate cases that the Constitution and Congress have granted them authority to hear.  *See* U.S. CONST. art. III,

§ 2; *Morris v. City of Hobart*, 39 F.3d 1105, 1110 (10th Cir. 1994).  Statutes conferring jurisdiction on federal courts are to be strictly construed.  *See F & S Constr. Co. v. Jensen*, 337 F.2d 160, 161 (10th Cir. 1964).  A Rule 12(b)(1) motion to dismiss "must be determined from the allegations of fact in the complaint, without regard to mere conclusory allegations of jurisdiction."  *Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir. 1971).  The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction.  *See Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).

Motions to dismiss pursuant to Rule 12(b)(1) may take two forms.  First, if a party attacks the facial sufficiency of the complaint, the court must accept the allegations of the complaint as true.  *See Holt v. United States*, 46 F.3d 1000, 1002-03 (10th Cir. 1995).  Second, if a party attacks the factual assertions regarding subject matter jurisdiction through affidavits and other documents, the court may make its own findings of fact.  *See id.* at 1003.  A court's consideration of evidence outside the pleadings will not convert the motion to dismiss to a motion for summary judgment under Rule 56.  *See id.*

Cherry Creek Card & Party Shop, Inc. v. Hallmark Marketing Corp., 176 F. Supp.2d

1091, 1094-95 (D. Colo. 2001).

A motion to dismiss pursuant to Rule 12(b)(6) alleges that the complaint fails "to

state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "A complaint

must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) if it does not plead 'enough facts

to state a claim to relief that is plausible on its face.'"  Cutter v. RailAmerica, Inc., 2008

WL 163016, at *2 (D. Colo. Jan. 15, 2008) (quoting Bell Atlantic Corp. v. Twombly, 550

U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)).  "While a complaint attacked by a Rule

12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's

obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels

and conclusions, and a formulaic recitation of the elements of a cause of action will not

do . . . ."  Twombly, 550 U.S. at 555 (citations omitted).  "Factual allegations must be

enough to raise a right to relief above the speculative level."  Id.  "[A] plaintiff must

14

'nudge [] [his] claims across the line from conceivable to plausible' in order to survive a motion to dismiss. . . .  Thus, the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."  Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting Twombly, 127 S. Ct. at 1974).

"[P]lausibility refers 'to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiff[] 'ha[s] not nudged [his] claim[] across the line from conceivable to plausible.'"  Khalik v. United Air Lines, 671 F.3d 1188, 1191 (10th Cir. 2012).  Furthermore, "[t]he nature and specificity of the allegations required to state a plausible claim will vary based on context."  Id.  "[T]he *Twombly/Iqbal* standard is 'a wide middle ground between heightened fact pleading, which is expressly rejected, and allowing complaints that are no more than labels and conclusions or a formulaic recitation of the elements of a cause of action, which the Court stated will not do.'"  Id.

For purposes of a motion to dismiss pursuant to Rule 12(b)(6), the court must accept all well-pled factual allegations in the complaint as true and resolve all reasonable inferences in the plaintiff's favor.  Morse v. Regents of the Univ. of Colo., 154 F.3d 1124, 1126-27 (10th Cir. 1998); Seamons v. Snow, 84 F.3d 1226, 1231-32 (10th Cir. 1996).  However, "when legal conclusions are involved in the complaint 'the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to [those] conclusions' . . . ."  Khalik, 671 F.3d at 1190 (quoting Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)).  "Accordingly, in examining a complaint under

15

Rule 12(b)(6), [the court] will disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." Id. at 1191.

Plaintiff is proceeding without counsel. The court, therefore, reviews his pleadings and other papers liberally and holds them to a less stringent standard than those drafted by attorneys . Trackwell v. United States Government, 472 F.3d 1242, 1243 (10th Cir. 2007). See Haines v. Kerner, 404 U.S. 519, 520-21 (1972) (holding allegations of a *pro se* complaint to less stringent standards than formal pleadings drafted by lawyers). However, a *pro se* litigant's conclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based. Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991). A court may not assume that a plaintiff can prove facts that have not been alleged or that a defendant has violated laws in ways that a plaintiff has not alleged. Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters, 459 U.S. 519, 526 (1983). See Whitney v. New Mexico, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (court may not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on plaintiff's behalf); Drake v. City of Fort Collins, 927 F.2d 1156, 1159 (10th Cir. 1991) (the court may not "construct arguments or theories for the plaintiff in the absence of any discussion of those issues). "The plaintiff's *pro se* status does not entitle him to application of different rules." Wells v. Krebs, 2010 WL 3521777, at *2 (D. Colo. Sept. 1, 2010).

### § 1983 Claim

Defendants correctly assert as a preliminary matter that as federal employees, they cannot be sued under 42 U.S.C. § 1983. That statute provides a remedy against

state and local officials.

### Statute of Limitations

"A *Bivens* action is subject to the limitation period for an action under 42 U.S.C. §
1983, and that limitation period is set by the personal injury statute in the state where
the cause of action accrues." Roberts v. Barreras, 484 F.3d 1236, 1238 (10th Cir. 2007).
Colorado's general two-year statute of limitations for personal injury actions, § 13-80-
102, C.R.S., thus applies to this case. Workman v. Jordan, 32 F.3d 475, 482 (10th Cir.
1994); Merrigan v. Affiliated Bankshares of Colo., Inc., 775 F. Supp. 1408, 1411-12 (D.
Colo. 1991).  Federal law, rather than state law, determines when a federal claim
accrues.  See Industrial Constructors Corp. v. U.S. Bureau of Reclamation, 15 F.3d
963, 968 (10th Cir. 1994).  "Under federal law, the statute of limitations on a *Bivens* claim
begins to run when the plaintiff knows or has reason to know of the existence and cause
of the injury which is the basis of his action."  Van Tu v. Koster, 364 F.3d 1196, 1199
(10th Cir. 2004) (internal quotations omitted).  "A plaintiff has reason to know of his injury
when he should have discovered it through the exercise of reasonable diligence."
Industrial Constructors Corp., 15 F.3d at 969.

Here, plaintiff's original Prisoner Complaint was dated February 6, 2012.  Under
the prison "mailbox rule," the Complaint should be deemed "filed" at the moment of its
delivery to prison authorities for forwarding to the District Court.  See Houston v. Lack,
487 U.S. 266 (1988).  Therefore, absent tolling, any claims based upon acts that
accrued more than two years before that date are time barred.

 Defendant Podolak asserts that the claims against her are time-barred because
the conduct that plaintiff is challenging took place more than two years before he

brought this suit.  She notes that the claims against her arise out of plaintiff's SHU placement in early June 2008 and his confinement there through May 2009 and that the plaintiff alleges he was informed after "several weeks" that "the Assistant United States Attorney assigned to his drug case directed that he be placed in the SHU."  (Docket No. 85, ¶ 9).  Therefore, she asserts that plaintiff was required to file a lawsuit raising claims against her within two years of when he was placed in the SHU or, at the latest, when he was allegedly told of her involvement in his placement there, i.e., no later than June or July of 2010.  Plaintiff, however, did not file this case until February 2012, more than a year and a half after the statute of limitations had run for a *Bivens* claim against her. Therefore, Podolak asserts that the claims against her should be dismissed.

Similarly, the other moving defendants assert that plaintiff's claims for money damages regarding his initial placement and confinement in the SHU (from July 27, 2008, until May 13, 2009) and his subsequent placement (on October 2, 2009) are barred by the statute of limitations.  They contend that the plaintiff did not file this action until nearly a year after the statute had run for a claim regarding his continued confinement from July 2008 through May 2009 and several months after the statute had run for a claim involving his subsequent placement in the SHU in October 2009.

The issue of tolling is also governed by state law.  Fratus v. DeLand, 49 F.3d 673, 675 (10th Cir. 1995).  "Once the statute of limitations is raised as an affirmative defense, the burden shifts to the plaintiff to show that the statute has been tolled." Garrett v. Arrowhead Imp. Ass'n, 826 P.2d 850, 855 (Colo. 1992).  Plaintiff acknowledges that he has such burden of proof (Docket No. 115 at 7), and he does not dispute that there is a two-year statute of limitations.  (See Docket No. 115 at 6).  He

18

submits, however, that several long periods of time should be excluded from the two-year period while his administrative remedies were being processed.

In his Responses, plaintiff engages in detailed calculations of the time he believes is excludable when determining whether his claims are timely.  When making such calculations, he asserts he is unsure of the exact date he was informed his SHU placement was arbitrarily enforced, but he uses July 15, 2008, as a reference point. With regard to plaintiff's claims concerning his first period of SHU placement, included in plaintiff's discussion regarding his calculations are representations that he submitted his first informal resolution attempt on September 11, 2008, and ultimately received a rejection of his appeal by the North Central Regional Office on December 12, 2008, in part because his appeal contained too many continuation pages.  Plaintiff states that the Notice stated that the appeal could be resubmitted within fifteen days of the date listed on the Notice (November 21, 2008), but by the time he received the Notice on December 12, 2008, the fifteen-day window to resubmit the appeal had expired. Moreover, plaintiff claims that after explaining this issue to "administrators" at FCI-ENG, he was told that because the time frame for re-submission had expired, he could not resubmit his appeal and no other remedies were available.  Furthermore, plaintiff claims that because he was unfamiliar with the BOP's administrative remedy process and was allegedly being denied access to legal materials that would properly instruct him on how to effectuate this process, he relied on the information provided to him by "prison administrators" and "assumed" that no other remedies were available.  He further claims, however, that he later learned (no date given) that the information given to him was incorrect, and he proceeded to re-file the necessary administrative papers with all

relevant BOP offices on January 27, 2010.

Plaintiff thus asserts that the time between December 12, 2008, and January 27, 2010, should be tolled because the "defendants" wrongfully impeded his ability to bring his claim by failing to provide adequate access to legal materials.  (Docket No. 115 at 11).  He also contends that there should be further tolling from January 27, 2010, through **September 7, 2011**, when he claims he received notification of the denial of his final administrative remedy from the BOP's Central Office.[3]

With regard to plaintiff's assertions concerning his second placement in SHU on October 2, 2009, plaintiff claims he was not informed that his SHU stay would be permanent[4] until October 8, 2009.  He states he submitted his informal resolution attempt on October 20, 2009, and he ultimately did not receive the Notice from the BOP Central Office of the denial of his appeal (which is the final step of the administrative remedy process) until **September 1, 2010**.

Plaintiff uses all of these dates in his calculation of the number of days that he asserts should be excluded time which allegedly renders his claims timely.  He then extends the two-year limitations period by the total number of allegedly excludable days to show he timely brought his claims.  The court, however, need not engage in such rigorous calculations to determine whether plaintiff's claims are time barred.  In making such a determination, the plaintiff is not entitled to a "wholesale tolling" (a term used by

---

[3]Plaintiff asserts that although the Central Office had actually denied his appeal on January 10, 2011, he did not receive the Notice of Denial until September 7, 2011.

[4]As noted above, plaintiff noted in his Response that he was in SHU until November 20, 2012.  (Docket No. 115 at 2).  Therefore, his SHU placement was not permanent as alleged in his Second Amended Complaint.

20

defendants) of all the time during which he was allegedly exhausting his administrative remedies. "[T]he statute of limitations is not automatically tolled whenever an individual pursues administrative remedies." Braxton v. Zavaras, 614 F.3d 1156, 1161 (10th Cir. 2010). Instead, under Colorado law, "an equitable tolling of a statute of limitations is limited to situations in which either the defendant has wrongfully impeded the plaintiff's ability to bring the claim or truly extraordinary circumstances prevented the plaintiff from filing his or her claim despite diligent efforts." Dean Witter Reynolds, Inc. v. Hartman, 911 P.2d 1094, 1099 (Colo. 1996). "The Colorado Supreme Court has yet to find a case that qualifies as an 'extraordinary circumstance' that would justify tolling." Braxton, 614 F.3d at 1160 (10th Cir. 2010).

Here, plaintiff has not shown any interference by any of the defendants in his efforts to exhaust his administrative remedies with respect to his claims, let alone that they interfered with his ability to bring this lawsuit. Plaintiff makes a general allegation in his Response that defendants wrongfully impeded his ability to bring his claims by failing to provide adequate access to legal materials. (See Docket No. 115 at 11). Earlier in the same Response, he claims that he was denied access to legal materials that would properly instruct him on how to effectuate the administrative remedy process, and he thus allegedly did not know what to do when on December 12, 2008, he received the Notice from the North Central Regional Office after the deadline contained in that Notice to re-file his appeal. As a result, he claims he did not take further action to re-file that appeal until more than a year later, and he asserts that time is excludable from his calculations concerning the timeliness of his claims here.

The court, however, takes judicial notice of the exhibits filed with the plaintiff's

original Complaint which include a list of the legal materials that plaintiff stated in his

administrative appeal were available to him while in SHU.  Those materials included

BOP Program Statements and the applicable Code of Federal Regulations (Docket No.

1 at 51-52).  Had plaintiff availed himself of those resources, they would have instructed

him on the administrative remedy process.  The court takes judicial notice of the BOP

Program Statements, namely Program Statement 1330.13, which concerns the

Administrative Remedy Program, and 28 C.F.R. § 542.13 and 542.15, both of which

detail the administrative remedy process.  The availability of these legal materials

support a finding that the plaintiff was not diligent in pursuing his administrative

remedies and thus was not diligent in bringing his claims here.

Moreover, even assuming all of the plaintiff's allegations are true, and he was

somehow impeded by "administrators" in completing the administrative review process

for that lengthy period, he still has not met his burden of showing that he is entitled to

tolling and that his claims here are thus timely.  As defendants correctly note, with

respect to the plaintiff's June 2008 SHU placement, plaintiff completed the

administrative review process on **September 7, 2011**, but he did not commence this

action until almost **five months** later on **February 6, 2012.**  With regard to his October

2009 SHU placement, he admittedly received the denial of his appeal to the Central

Office (the last step of the administrative review process) on **September 1, 2010**, at

which time he still had more than a year of the limitations period remaining, but he did

not commence this action until more than **17 months** after he exhausted his

administrative remedies.  In fact, plaintiff's own defense counsel on the federal drug

charges averred in motion papers filed on October 22, 2010, that plaintiff had exhausted

22

his administrative remedies with respect to his continued "ad-seg" confinement.

(Docket No. 1, at 90-91; Supplemental Brief in Support of Motion for Order Directing

Contact Visits, filed in Criminal Action No. 07-cr-00184-WYD-4 at Docket No. 955,

submitted by plaintiff here as an exhibit to his original Prisoner Complaint).

"Even if the administrative exhaustion requirement constitutes an 'extraordinary

circumstance' preventing plaintiff[] from filing suit, plaintiff[] still must 'make[] good faith

efforts to pursue the claims when possible. . . .  Thus, whether plaintiff[] [is] entitled to

equitable tolling depends on whether [he] diligently pursued [his] claims following the

exhaustion of [his] administrative remedies." Braxton, 614 F.3d at 1162 (internal citation

omitted).  Here, this court finds that the plaintiff did not pursue his claims with diligence

after the administrative remedy process was concluded.  See id. (plaintiffs not entitled to

tolling when they waited approximately two years after administrative remedy process

was complete to file section 1983 suit); Rosales v. Ortiz, 325 Fed. App'x 695, 699 (10th

Cir. Apr. 30, 2009) (equitable tolling not warranted when the inmate had period of six

weeks and another period of six months remaining to file suit after exhausting

administrative remedies, but he did not file suit within those periods and waited the

better part of a year).

Based upon these findings, it is recommended that the following claims be

dismissed with prejudice as time barred: (1) claims regarding plaintiff's initial placement

and confinement in the SHU (from July 27, 2008, until May 13, 2009) [portion of Claim

One, portion of Claim Two concerning this time period, and Claim Four], (2) claims

regarding his subsequent SHU placement on October 2, 2009 [rest of claims in Claim

One]; and (3) plaintiff's First Amendment claims against Kuta contained in Claim

Three(a) concerning Kuta's alleged refusal to respond to plaintiff's administrative appeal regarding threats made in August 2008.

### Access to the Court Claim

Plaintiff's claims in Claim Three(b) concerning not being provided necessary legal materials, which are not time barred, only include allegations against dismissed defendant Davis.  Therefore, that portion of Claim Three has already been dismissed without prejudice.

### Claims for Injunctive and Declaratory Relief

Defendants correctly assert in their Replies that given the plaintiff's release from SHU, his claims for injunctive and declaratory relief are moot and should be dismissed. See Jordan v. Sosa, 654 F.3d 1012, 1033-34 (10th Cir. 2011).  "The crux of the mootness inquiry in an action for prospective relief is whether the court can afford meaningful relief that will have some effect in the real world."  Rezaq v. Nalley, 677 F.3d 1001, 1008 (10th Cir. 2012) (quotations omitted).  "When prospective equitable relief is requested, the requesting party must show an ongoing, personal stake in the outcome of the controversy, a likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law. . . . Similarly, in the context of an action for declaratory relief, a plaintiff must be seeking more than a retrospective opinion that he was wrongly harmed by the defendant."  Id. (citations omitted).  Plaintiff has made no such showing here.

### Substantive and Procedural Due Process Claims

Based on the findings above, the only claims remaining are those contained in Claim Two concerning (1) substantive due process violations regarding the conditions of

24

the plaintiff's pretrial detention in administrative detention after February 6, 2010, and

(2) procedural due process violations regarding the lack of review of his SHU placement

after February 6, 2010.

The court takes judicial notice that in February 2011, plaintiff was convicted in

state court of first-degree murder, solicitation to commit first-degree murder, conspiracy

to commit first-degree murder, and aggravated intimidation of a witness or victim and

was sentenced to life plus 120 years in prison.[5]  Plaintiff contends in his Response that

he was still a pretrial detainee after that conviction and sentence because he is not fully

adjudicated guilty until after the conclusion of his appeal.  This court finds, however, that

as of his conviction in February 2011, plaintiff was not longer a pretrial detainee.  See

Berry v. City of Muskogee, Okl., 900 F.2d 1489, 1493 (10th Cir. 1990) (distinguishing

"pretrial detainees" from those persons whose guilt has been adjudicated).

This court finds that the remaining claims, even liberally construed, do not rise to

the level of a constitutional violation and should be dismissed under Rule 12(b)(6).  See

Peoples v. CCA Detention Centers, 422 F.3d 1090, 1105 (10th Cir. 2005).  "Due process

requires that a pretrial detainee not be punished prior to a lawful conviction."  Id. at 1106

(citing Bell v. Wolfish, 441 U.S. 520, 535 (1979); Littlefield v. Deland, 641 F.2d 729, 731

(10th Cir. 1981)).  Nevertheless, "the government may subject those awaiting trial to the

conditions and restrictions of incarceration so long as those conditions and restrictions

do not amount to punishment."  Id. at 1106 (citing Bell, 441 U.S. at 536-37).[6]

---

[5]Plaintiff states in his Response that he was convicted on February 4, 2011. (Docket No. 114 at 31, n.3).

[6]The court notes that the Tenth Circuit has stated that Sandin v. Conner, 515 U.S. 472 (1995), "leaves Bell, which is the Court's watershed case involving pretrial

25

Determining "whether a condition of pretrial detention amounts to punishment turns on whether the condition is imposed for the purpose of punishment or whether it is incident to some other legitimate government purpose." Id. If the prison official's act of placing and keeping the detainee in segregation is done with an intent to punish, the act constitutes unconstitutional pretrial punishment. Id. "Similarly, 'if a restriction or condition is not reasonably related to a legitimate [governmental] goal-if it is arbitrary or purposeless-a court permissibly may infer that the purpose of the governmental action is punishment.' . . . On the other hand, restraints that 'are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting.'" Id. (quoting Bell, 441 U.S. at 539, 540).

Here, the exhibits plaintiff submitted with his original Complaint and to which he refers in his pleading provide the prison officials' reasoning for his placement in SHU as a pretrial detainee. For example, in a written Response from Harrell Watts, Administrator National Inmate Appeals, dated August 31, 2010, plaintiff was advised:

> We reviewed pertinent information regarding your placement in AD and concur with the decision. Although you claim not to pose a risk to institutional security, **given the charges you face in criminal court and the nature of the public attention it has generated**, we conclude the Warden's decision is consistent with the objectives of maintaining a safe and orderly institution. The Warden, we remind you, is responsible for maintaining the security of the institution and protection of the public. As such, he retains the autonomy to determine appropriate housing assignments and, of course, considers all relevant information in the process. Your assignment to AD will be continuously assessed. We do not find any reason to reverse or amend the Warden's decision. Your appeal is denied.

---

detainees, untouched." Peoples, 422 F.3d at 1106 n.12.

(Docket No. 1 at 87) (emphasis added).  Plaintiff's criminal defense attorney in plaintiff's

federal drug case stated in motion papers with respect to the highlighted statement

above that "[p]resumably, the BOP is referring to the state criminal charges against

[plaintiff] relating to the homicide of witness Kalonnian Clark (Denver District Court Case

No. 10479).  Indeed, this is the very reason undersigned counsel was given for

[plaintiff's] placement in ad seg when counsel first entered in this case and asked

government counsel why [plaintiff] was being held in the SHU."  (Docket No. 1 at 93).

The Tenth Circuit has found that "[o]bviously, 'ensuring security and order at the

institution is a permissible nonpunitive objective, whether the facility houses pretrial

detainees, convicted inmates, or both.' . . . Thus, 'no process is required if [a pretrial

detainee] is placed in segregation not as punishment but for managerial reasons."

Peoples, 422 F.3d at 1106 (citation omitted).  "A detention center . . . has a legitimate

interest in segregating individual inmates from the general population for non-punitive

reasons, including threat[s] to the safety and security of the institution." Id. (quotation

omitted).  Plaintiff's highly-publicized state criminal case, which concerned the homicide

of a witness while plaintiff was incarcerated, is a legitimate nonpunitive rationale for his

continued placement in administrative segregation.  Therefore, while plaintiff alleges

that his later SHU placement was intended as punishment, a review of the facts the

plaintiff himself has alleged does not show that the defendants intended to punish him

by placing him in segregation.  Rather, it appears they acted in furtherance of legitimate

penal objectives of safety and security of the facility based on concerns as a result of

his highly-publicized state criminal case.  Therefore, the court recommends dismissal of

the remaining due process claims.  See id. at 1106-07 (affirming dismissal of Fifth

27

Amendment due process claims based upon detainee's placement in administrative

segregation done on the advice of the Marshal Service and based on concerns that the

plaintiff was an escape risk).

Based upon the foregoing, it is hereby

**RECOMMENDED** that the Motion to Dismiss by Stephanie Podolak (Docket No.

98) be **granted**.  It is further

**RECOMMENDED** that the Motion to Dismiss by Defendants Garcia, Kuta,

Dosanj, Brown, Snider, and Chavez (Docket No. 99) be **granted**.

**NOTICE:  Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b)(2),**

**the parties have fourteen (14) days after service of this recommendation to serve**

**and file specific written objections to the above recommendation with the District**

**Judge assigned to the case.  A party may respond to another party's objections**

**within fourteen (14) days after being served with a copy.  The District Judge need**

**not consider frivolous, conclusive, or general objections.  A party's failure to file**

**and serve such written, specific objections waives *de novo* review of the**

**recommendation by the District Judge, <u>Thomas v. Arn</u>, 474 U.S. 140, 148-53**

**(1985), and also waives appellate review of both factual and legal questions.**

**<u>Makin v. Colorado Dep't of Corrections</u>, 183 F.3d 1205, 1210 (10th Cir. 1999); <u>Talley</u>**

**<u>v. Hesse</u>, 91 F.3d 1411, 1412-13 (10th Cir. 1996).**


Date:  August 16, 2013                    s/ Michael J. Watanabe
          Denver, Colorado                    Michael J. Watanabe
                                                         United States Magistrate Judge